**COMMISSIONER OF INTERNAL REV-ENUE, Petitioner,**

v.

**Walter L. and Helen MORGAN, Respondents.**

**No. 13306.**

United States Court of Appeals Third Circuit.

Argued Dec. 16, 1960.

Decided March 21, 1961.

Rehearing Denied April 13, 1961.

Crombie J. D. Garrett, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Meyer Rothwacks, Harry Baum, Abbott M. Sellers, Acting Asst. Atty. Gen., Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., on the brief), for petitioner.

William R. Spofford, Philadelphia, Pa. (Andrew B. Young, Ballard, Spahr, Andrews & Ingersoll, Stradley, Ronon, Stevens & Young, Philadelphia, Pa., on the brief), for respondents.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

STALEY, Circuit Judge.

This petition for review requires us to determine whether distributions made to

a shareholder pursuant to a corporate liquidation are taxable as dividend income under subsection 112(c) (2) or as a long term capital gain under subsection 115(c) of the Internal Revenue Code of 1939, 26 U.S.C.A. (Int.Rev.Code 1939), which provisions control here.

For many years Wellington Fund, Inc. ("Fund"), a mutual fund, had separate contracts with Wellington Corporation ("transferor") for investment advisory services, and with W. L. Morgan & Company ("transferee") for the national promotion and distribution of the Fund's

securities. These contracts constituted the principal if not exclusive business of the transferor and transferee. In 1952, the Fund terminated its contract with transferor and immediately thereafter entered into a contract with transferee for identical services.

Transferor was then liquidated, and the assets that it had utilized in performing the contract with the Fund were conveyed to the transferee. In addition, the following distributions were made to the taxpayer, transferor's sole stockholder:

| May 27, 1952 | Cash | $100,000.00 |
| June 1, 1952 | United States Treasury Bonds | 48,906.25 |
| Sept. 18, 1952 | Cash | 65,244.74 |
| | | $214,150.99 |

In his 1952 tax return, the taxpayer [1] reported $212,150.99 ($214,150.99 distribution less cost of his stock) as a long term capital gain under subsection 115 (c).[2] The Commissioner, however, determined a deficiency on the ground that the distribution was taxable as dividend income under the related provisions of subsections 112(b) (3), (c) (1) and (2).[3] The Tax Court held that even assuming

[1] References to taxpayer are to Walter L. Morgan only, since his wife, Helen Morgan, is a party only because she joined in the return.

[2] "§ 115(c) Distributions in liquidation.—Amounts distributed in complete liquidation of a corporation shall be treated as in full payment in exchange for the stock, and amounts distributed in partial liquidation of a corporation shall be treated as in part or full payment in exchange for the stock. The gain or loss to the distributee resulting from such exchange shall be determined under section 111, but shall be recognized only to the extent provided in section 112. * * *" 26 U.S.C.A. (Int.Rev.Code 1939) § 115(c).

[3] "§ 112(b) Exchanges solely in kind—
* * * * * *
"(3) Stock for stock on reorganization—No gain or loss shall be recognized if stock or securities in a corporation a party to a reorganization are, in pursuance of the plan of reorganization, exchanged solely for stock or securities in such corporation or in another corporation a party to the reorganization."

"§ 112(c) (1) If an exchange would be within the provisions of subsection (b) (1), (2), (3), or (5), * * * if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph or by subsection (*l*) to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but in an amount not in excess of the sum of such money and the fair market value of such other property."

"§ 112(c) (2) If a distribution made in pursuance of a plan of reorganization is within the provisions of paragraph (1) of this subsection but has the effect of the distribution of a taxable dividend, then there shall be taxed as a dividend to each distributee such an amount of the gain recognized under paragraph (1) as is not in excess of his ratable share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913. The remainder, if any, of the gain recognized under paragraph (1) shall be taxed as a gain from the exchange of property." 26 U.S.C.A. (Int.Rev.Code 1939) § 112(b), (c) (1), (c) (2).

all the other conditions had been met, the distribution could not qualify as dividend income because there had not been an actual exchange of stock between taxpayer and transferee.[4] The Commissioner here maintains that in substance and effect an exchange of stock was made since the taxpayer owned all the stock in both transferor and transferee.

In order to sustain the Commissioner, it must be shown that (1) there was a distribution of property or money ("boot") in addition to an exchange of stock all made in pursuance of a plan of reorganization, and (2) that such boot has the effect of a taxable dividend, i. e., it is not in excess of the taxpayer's share of the undistributed earnings and profits of the corporation accumulated after February 28, 1913.[5]

We think that a chronological statement of the facts in the record, uncontradicted, largely stipulated and as found by the Tax Court, leads irresistibly to the conclusion that the distributions here were made in pursuance of a plan of reorganization.[6]

At all times relevant, taxpayer was president and board chairman as well as sole stockholder of both transferor and transferee, which were organized in 1929 and 1931 respectively. Another board member was Joseph E. Welch, who was also a principal executive officer in transferor, transferee, and the Fund. The taxpayer was also president of the Fund and chairman of its board. The ten other members of the board consisted of four executive officers in the transferor and transferee, the father of taxpayer's wife who died in 1941, business associates with taxpayer in other enterprises, and two others with whom he had no apparent business relationship. Four out of five and five out of seven executive officers of transferor and transferee respectively served on the Fund's board.

4. Walter L. Morgan, 33 T.C. 30.

5. The parties stipulated that the distributions did not exceed such earnings.

6. "The term 'reorganization' means * * (D) a transfer by a corporation of all

For the fiscal year ended May 31, 1951, transferor reported an income of $305,-175.96. However, no dividends were paid that year. During late 1951 and early 1952, an internal revenue agent on several occasions met with transferor's representatives and discussed the imposition of a surtax under section 102 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 102 for an allegedly improper accumulation of surplus. On February 11, 1952, a conference was held between the agent's group chief and transferor's representatives without any agreement being reached.

At the Fund's board meeting held on February 27, 1952, taxpayer raised the question of transferring the contract from transferor to transferee. It was the consensus of the board that the contract with transferor should be terminated and one calling for similar services be entered into with transferee which was to change its name to include the word "Wellington." Minutes of that meeting, signed by the Fund's secretary, who was a vice president in both transferor and transferee, contained the following:

" * * * and it was the sense of the meeting that the present contract between the Fund and Wellington Corporation should not be renewed but that the activities of Wellington Corporation and W. L. Morgan & Co. should be combined into one company for greater efficiency and the Investment Advisory Contract be made with this company."

At that meeting, taxpayer also presented a form of proposed investment services contract with transferee, apparently identical in all essential respects with the contract then in effect between the Fund and transferor.

At a special meeting of transferor's board attended by taxpayer and Welch, held on March 3, 1952, to discuss termi-

or a part of its assets to another corporation if immediately after the transfer the transferor or its shareholders or both are in control of the corporation to which the assets are transferred * * *." 26 U.S.C.A. (Int.Rev.Code of 1939) § 112(g) (1) (D).

nation of its contract with the Fund, taxpayer stated that when a new contract with transferee was approved by the Fund, all of transferor's employees would be placed on transferee's payroll.

In soliciting the Fund's shareholders for approval of the change, a proxy dated March 7, 1952, prepared under order of the Fund's board and distributed over the name of its secretary, who was a vice president in both transferor and transferee, contained the following:

"Investment Advisory Agreement with The Wellington Company

"For greater efficiency and corporate simplification and economy, the Directors of Wellington Corporation, the investment advisor for Wellington Fund, Inc., and the Directors of W. L. Morgan & Co., the sponsor and national distributor for the Fund, have resolved that their activities should be combined into one company to be called The Wellington Company. Under this arrangement, the general management, investment management and research services and distribution activities will be conducted in the future by separate departments of one corporation rather than by two corporations as heretofore. This arrangement involves no changes in investment or management policies or practices. The Executive Committee, Investment Committee and the entire statistical and research staff and all employees of the investment advisor will become associated with The Wellington Company with the same duties and responsibilities as heretofore. *The name of W. L. Morgan & Co. will be changed to The Wellington Company, and the present Wellington Corporation will be dissolved.*" (Emphasis supplied.)

The shareholders met on April 9, 1952, at 3:00 P. M. and approved the contract with transferee. At 4:00 P.M. on that same date, transferee's board at a special meeting resolved that transferee would assume the obligation transferor had toward its employees under a profit-

sharing plan. The minutes of that meeting also indicate that transferee had already decided to change its name to include the word "Wellington."

On April 10, 1952, the contract with transferor was terminated and on April 12, 1952, one calling for similar services was entered into with transferee.

In the meantime, transferee took over the transferor's furniture and other equipment, research data, and all of transferor's employees together with the employees' profits sharing plan.

On May 27, 1952, after unsuccessfully attempting to secure new business, transferor's board, pursuant to taxpayer's written consent, resolved to liquidate.

Upon completion of the arrangements outlined above, the transferee had a new corporate division devoted to investment counselling. Without hiatus an intact capability to perform the contract with the Fund was transplanted from transferor to transferee. Taxpayer continued to be the sole stockholder of transferee. Also, the transferor, as taxpayer himself testified, could perform no investment advisory services without the use of transferee's personnel.

 It is clear to us that these actions constituted the carrying out of a plan of reorganization under subsection 112(g) (1) (D).

 The taxpayer contends there was no reorganization since the contract with the Fund, the transferor's most valuable asset, was not transferred. This, of course, is without merit. We need not articulate the obvious answer which the facts compel, for the subsection involved requires only that a part of the assets be transferred. Becher v. Commissioner, 2 Cir., 1955, 221 F.2d 252; Lewis v. Commissioner, 1 Cir., 1949, 176 F.2d 646; 3 Mertens, Law of Federal Income Taxation, ¶ 20.91 (1957).

As we noted earlier, the Tax Court held that there must be an actual physical exchange of stock before the distribution here could be taxable as dividend income. With this conclusion we cannot agree, for it is contrary to the purposes that Con-

gress meant to serve in enacting subsections 112(b) and (c) (2).

[3] Subsection 112(c) (2) was enacted to reach and tax as ordinary income gain realized by a stockholder from a corporate reorganization to the extent that such gain constitutes undistributed earnings. It appeared as subsection 203 (d) (2) of the Revenue Act of 1924, 26 U.S.C.A. (Rev.Act of 1924). The Senate Finance Committee Report [7] accompanying the 1924 Act and commenting on that subsection stated:

"The committee approves certain amendments to the income tax law contained in the House bill to stop the methods of avoidance which are now being commonly availed of by taxpayers.

"(1) The provisions of the reorganization section of the present law have been rewritten to prevent the use of the section to escape proper taxation * * * by distributing as capital gain what are in effect dividends out of earnings."

If the transferor's assets had been transferred to a newly formed corporation in exchange for stock, there is no question that the boot would have been taxable as dividend income. That an existing corporation in which the taxpayer was the sole shareholder was used instead of a newly formed one cannot alter the true nature of the transaction. Here, the issuance of new stock would have been a meaningless gesture since the stock the taxpayer already held represented the total value of all the assets except for the boot.

Liddon v. Commissioner, 6 Cir., 230 F. 2d 304, certiorari denied 1956, 352 U.S. 824, 77 S.Ct. 34, 1 L.Ed.2d 48, which involved similar facts, fully supports our conclusion. There, the taxpayers, husband and wife, owned eighty per cent of the stock in a corporation engaged in selling and servicing automobiles under a franchise dealer contract with General Motors Corporation, while one Davis owned the other twenty per cent. Davis' offer to sell his stock to the taxpayers for book value was refused. Thereafter, taxpayers established a new corporation in which they owned all but one share of stock and secured a new franchise contract. The new corporation then agreed to a plan whereby it would purchase the old corporation's assets and accept an employees' retirement fund. Taxpayers invested an additional twenty thousand dollars in personal funds in the new corporation. Thereafter Davis' stock was purchased by the old corporation, which was then dissolved, and $150,000 in cash and notes distributed to the taxpayers, which the Commissioner contended, and the Tax Court agreed, should be taxed as ordinary income and not as capital gain. In affirming on this point, Judge Stewart, now Justice Stewart, approved and summarized the Tax Court's reasoning, 230 F.2d at pages 306–307:

"Moreover, since at the beginning of the series of transactions the petitioners held stock in the old corporation, and at the end they held stock in the new corporation, plus 'money-to-boot,' the court reasoned that, although there was not a direct exchange of stock in the old corporation for stock in the new, plus 'other property or money,' that was the net effect of what was done. Accordingly, the court concluded that the case was governed by sections 112(b) (3) and 112(c) of the 1939 Code."

Taxpayer cites Emma Cramer, 1953, 20 T.C. 679, and Trianon Hotel Co., 1958, 30 T.C. 156, which are inapplicable since in neither of these cases did the court conclude that there was a reorganization as was the case both here and in Liddon.

The decision of the Tax Court will be reversed and the cause remanded for further proceedings not inconsistent with this opinion.

7. S.Rep. No. 398, 68th Cong., 1st Sess. p. 7 (1939–1 Cum.Bull. (Part 2) 266, 271).

HASTIE, Circuit Judge (dissenting).

The question here is whether the gain element in the sum of $214,150.99 received by the taxpayer in 1952 in exchange for his stock in Wellington Corp., upon total liquidation of that corporation, is taxable as long term capital gain under Section 115(c) of the Internal Revenue Code of 1939 or whether it may be taxed as ordinary income in the nature of a dividend received in the course of a reorganization under Section 112(c) (2).

This court now holds that the taxpayer's gain is taxable as ordinary income. In so doing it recognizes that the result it reaches can be achieved only by fitting the transactions in this case within the situation described in Section 112(b) (3) and (c) (1)—i. e., where "stock or securities in a corporation a party to a reorganization are * * * exchanged * * * for stock or securities * * * in another corporation a party to the reorganization" and, in addition to stock thus received, the stockholder also receives "other property or money". In the words of the majority opinion, "it must be shown that (1) there was a distribution of property or money ('boot') in addition to an exchange of stock all made in pursuance of a plan of reorganization, and (2) that such boot has the effect of a taxable dividend * * *." I agree that the plain language of the statute requires that there be an exchange of stock. Trianon Hotel Co., 1958, 30 T.C. 156; Emma Cramer, 1953, 20 T.C. 679; 3 Mertens, Federal Income Taxation, 1957, § 20.147.

Having thus stated what the statute requires, the court also recognizes that the series of transactions in this case involved no actual acquisition of stock by the taxpayer either through an ordinary exchange or, as in Liddon v. Commissioner, 6 Cir., 1956, 230 F.2d 304, upon which the court relies, through the creation of a new corporation during a reorganization with the taxpayer as an original stockholder. It is argued, however, that in this case no transfer of stock of a corporation to the taxpayer is the legal equivalent of an actual stock transfer merely because the taxpayer already was and long had been sole stockholder of that corporation. I can see no logical basis for thus finding an exchange of stock within the statutory requirement without any demonstration that something happened in this case which was equivalent to a transfer of stock to the taxpayer.

There may be one situation in which it is properly arguable that the equivalent of a stock transfer has occurred pursuant to a reorganization though technically there was no transfer. Assume a case which is like the present one in that an individual owns all the stock of both a liquidating corporation and a second corporation which assumes the functions of the liquidating corporation, but with the additional fact that the worth of the second corporation is substantially increased in a reorganization by an intercorporate transfer of valuable assets of the liquidating corporation. The reorganization deprives the individual of his stock in the first corporation and in return enhances the value of his ownership of the transferee corporation. Such added worth of the second corporation might be the basis for the issuance of new certificates, but it would be pointless to issue new certificates to one who already is the sole stockholder. Therefore, for purposes of Section 112(c) it is arguable that such a case should be treated as one in which there has been an exchange of stock for stock without requiring the formality of a new stock issue.

But on the record here there was no substantial increase in the worth of the second corporation through any transfer of assets by the liquidating corporation. The only intercorporate transfers of assets in this case are described as follows in the unchallenged findings of the Tax Court:

"Subsequent to the adoption of the liquidating resolution, the Corporation sold its office furniture and equipment to the Company for a price set by the Company's firm of accountants as the fair market value thereof. We have no issue as to

gain or loss on this sale. The Corporation also transferred to the Company possession of, access to, and the right to make use of certain investment statistical and research material, if not title thereto, without consideration of any kind."

As a sale for fair value, the transfer of office furniture and equipment did not enrich the transferee corporation. While statistical and research data may have substantial utility, it is not claimed that in the circumstances of this case the transfer of data substantially increased the worth of the transferee corporation. Of course, the reemployment of employees of the liquidating company by the transferee company, which the majority emphasizes, is not a transfer of assets and does not increase corporate worth.

One other item deserves mention in this connection. It is the contract long held by the liquidating corporation to render investment advisory services to Wellington Fund, Inc. Its duration paralleled that of the present transferee corporation's separate contract with the Fund for promotional services. The Tax Court found that the Fund made a business decision to attempt to reduce its costs and gain other advantages by contracting with a single corporation for both advisory and promotional services. Accordingly, the Fund cancelled its contract with its longtime adviser and two days later entered into a similar contract with the company which theretofore had done only promotional work for it.

This action of the Fund ruined the business of the original advisory corporation and caused its liquidation. It also conferred a very substantial economic advantage on the transferee corporation. But that is not enough to make the Fund's action significant for present purposes. Our concern is with property transfers between a liquidating corporation and a transferee corporation within and pursuant to a plan of reorganization. There was here no assignment of contract rights between such corporations. Nor is it found as a fact that they or their sole stockholder either could or did use the Fund as an instrumentality to do their bidding. True, their sole stockholder was also President and Chairman of the Board of the Fund. But the Tax Court found that he, his family and his close business associates owned only .003 percent of the stock of the Fund. It has already been pointed out that the Fund derived a business advantage of its own from shifting its contractual arrangement for advisory services. Moreover, under the Tax Court's findings, the decision to liquidate was not made until after the shifting of the Fund's contract and only after a search for other business to replace the cancelled contract had proved unsuccessful. It seems worthwhile to spell this matter out in some detail because in my view it involves the only doubtful point in this case, even though on this point I do not disagree with the majority opinion which apparently concedes that the conduct of the Fund in cancelling one contract and entering into another did not constitute a transfer of assets between the two service companies and was not a step in a reorganization.

In these circumstances, I do not see how it can be said in any meaningful way that there was in this case even a conceptual exchange of stock, and, of course, there was not a real one.[1] Therefore, Section 112(c) is inapplicable and the decision of the Tax Court should be affirmed.

1. Although I can find no Section 112 exchange of stock here to prevent treatment of the present distribution as one made in liquidation under Section 115(c), I recognize that the taxpayer is accomplishing a type of "bail-out" of accumulated corporate earnings while the same business continues in another corporation under his ownership and control. If this discloses a "loophole" in the statutory taxing scheme which should be closed, resort should be to Congress for appropriate action. In this connection see the discussion of a proposed amendment to Section 356(a) (2) (B) (ii) in Revised Report on Corporate Distributions and Adjustments, transmitted to the House Committee on Ways and Means by the Advisory Group on Subchapter C, at 66–67 (1958).