Joseph SIMON and Jonnie H. Simon, Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

Warner L. MATHIS and Hazel Mathis, Petitioners-Appellees,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

John M. BEARD, Jr., Petitioner-Appellee,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellant.

No. 79–2700.

United States Court of Appeals, Fifth Circuit. Unit B

April 17, 1981.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Chief, Appellate Section, Michael L. Paup, Helen A. Buckley, Tax Div., Dept. of Justice, Washington, D. C., for respondent-appellant.

Ball, Ball, Duke & Matthews, William S. Duke, John R. Matthews, Jr., Montgomery, Ala., for petitioners-appellees.

Before SIMPSON, RONEY and THOMAS A. CLARK, Circuit Judges.

RONEY, Circuit Judge:

The sole issue on appeal is whether a distribution by a company to its shareholders was incident to a liquidation or to a reorganization. If a liquidation, the distribution is taxed as capital gains. If a reorganization, it is taxed as ordinary income. The Tax Court found a liquidation. We reverse, holding the distribution, preceded by a transfer of "substantially all" of the company's operating assets to another company owned by the shareholders, was a step in a plan of reorganization.

### The Facts

This litigation, the basic facts of which are not in dispute, centers on the transfer of the operating assets of Capital Sales, Inc., to Southern Sash Supply Co., and the subsequent dissolution of Capital Sales. Both corporations were owned and operated by the taxpayers in this case, Joseph Simon, John Beard, and Warner Mathis. Mathis was president and majority shareholder of Capital Sales prior to its dissolution in 1974 and has continued to serve as president and principal stockholder of Southern Sash. Both corporations were incorporated in Alabama and engaged in the building supply business, although Southern Sash's gross receipts have been much larger than those of Capital Sales. In the 1973 fiscal year, for example, Southern Sash grossed approximately $3 million while Capital Sales had

an income of only $125,000. The two companies shared common office and warehouse space, together with a third corporation owned by taxpayers. They also shared salespersons.

Shortly after its incorporation in 1960, Capital Sales became a distributor of Modernfold doors, which at the time were manufactured by New Castle Products, Inc. Although it later added other products to its line, the sale of these doors accounted for most of its business, approximately eighty percent by 1973.

In 1968, Capital Sales and New Castle Products entered into a written agreement which designated Capital Sales as a distributor of Modernfold doors for south central Alabama. The agreement further provided that it was nonassignable and could be cancelled by either party without cause upon thirty days notice. Although this distributorship agreement was not expressly termed a "franchise," it is referred to as such by the parties to this lawsuit and by the Tax Court.

Sometime after this agreement was entered into, New Castle Products was purchased by American-Standard Company. American-Standard manufactured larger and more expensive products including movable walls selling for $100,000 or more each, in addition to the Modernfold doors handled by Capital Sales.

In 1973, E. C. Gilmore, a salesman for Capital Sales who handled the Modernfold account, told Mathis he had been informed by officials of American-Standard that they were considering shifting the Modernfold franchise to another distributor, because they preferred larger companies to distribute their products. The officials expressed their willingness, however, to transfer the Modernfold account to Southern Sash since it was considerably larger than Capital Sales. Mathis agreed it would be better to have the franchise transferred to Southern Sash than to lose it to an unrelated company.

After further discussions between Gilmore and American-Standard's sales representative and sales manager, the proposed transfer of the account was arranged. On December 18, 1973, American-Standard's credit manager wrote Capital Sales: "Effective December 31, 1973, we are changing our records to show Southern Sash Supply . . . as the distributor but we will not change the distributor number that has been assigned to you." The letter also stated that after December 31 further shipments would be billed to Southern Sash rather than to Capital Sales.

In January 1974, the taxpayers, convening as Capital Sales' shareholders and board of directors, voted to dissolve the company. All of its assets other than cash, certificates of deposit, and investments in stock were sold to Southern Sash for approximately $54,000. The assets sold included notes and accounts receivable, outstanding Modernfold door orders, and an automobile used in the business. About $135,000, representing the remaining assets held by Capital Sales as well as the proceeds from the sale to Southern Sash, was then distributed to the shareholders, and the corporation was formally dissolved.

On their 1974 tax returns, taxpayers treated the distributed amount as received in a complete liquidation, taxable as capital gain. I.R.C. § 331, 26 U.S.C.A. § 331. The Government assessed deficiencies, contending the distribution was incident to a reorganization, taxable as ordinary income. I.R.C. §§ 356, 368, 26 U.S.C.A. §§ 356, 368. The Government also imposed an accumulated earnings tax on Capital Sales, which was upheld by the Tax Court and is not contested on this appeal.

### The Issues

The type of reorganization the Government alleges occurred in this case is defined by sections 354 and 368 of the Internal Revenue Code, which in distilled form set forth the following requirements:

(1) There must be a transfer by a corporation [§ 368(a)(1)(D)];

(2) of substantially all of its assets [§ 354(b)(1)(A)];

(3) to a corporation controlled by the shareholders of the transferor-corporation or by the transferor-corporation itself [§ 368(a)(1)(D)];

(4) in exchange for stock or securities of the transferee corporation [§ 354(a)(1)];

(5) followed by a distribution of stock or securities of the transferee-corporation to the transferor's shareholders [§ 354(b)(1)(B)];

(6) pursuant to a plan of reorganization [§ 354(b)(1)].

*Smothers v. United States,* 642 F.2d 894 (5th Cir. 1981).

■ In this case, it is undisputed that a transfer took place, and that the taxpayers controlled both Capital Sales, the transferor corporation, and Southern Sash, the transferee company. An exchange and distribution of stock are also conceded, even though no Southern Sash stock was exchanged at the time of the transfer or distributed in the liquidation. The law is well settled that where shareholders of the transferor corporation already own all of the stock of the transferee corporation, the issuance of further stock for exchange and distribution is not required. *See, e. g., Davant v. Commissioner,* 366 F.2d 874, 886–87 (5th Cir. 1966); *Commissioner v. Morgan,* 288 F.2d 676, 680 (3d Cir. 1961); *Wilson v. Commissioner,* 46 T.C. 334, 342–44 (1966).

The disputed issues are whether there was a transfer of "substantially all" of the assets of Capital Sales, and, if so, whether the transfer was pursuant to "a plan of reorganization."

### Transfer of "Substantially All" of the Assets

The Tax Court held the requirement of a transfer of "substantially all" transferor Capital Sales' assets was not met, because American-Standard rather than Capital Sales directed the transfer of the principal operating asset, the Modernfold door franchise. The court, with four judges dissenting, concluded that absent a transfer by Capital Sales of this franchise, the Government improperly used step-transaction anal-

ysis in characterizing the series of events as a reorganization. Under step-transaction analysis, the events are reviewed as a whole to determine whether they are integrated parts of a scheme of reorganization.

As the Tax Court noted, there are apparently no previous cases in this Circuit or elsewhere which have squarely addressed whether a transfer under these circumstances precludes a finding of reorganization. An analysis of closely-related cases, however, indicates the transfer of the franchise as well as the subsequent liquidation and distribution should be viewed as steps in a reorganization.

■ A scheme of reorganization is characterized by a continuity of the original business by the same shareholders. *Helvering v. Alabama Asphaltic Limestone Co.,* 315 U.S. 179, 184–85, 62 S.Ct. 540, 543–44, 86 L.Ed. 775 (1942); *Davant v. Commissioner,* 366 F.2d 874, 882–83 (5th Cir. 1966). A reorganization will be found for tax purposes when, after the completion of a series of transactions, the taxpayers are "in control of the same going business as before, albeit in a new corporate shell, having in the meantime extracted a substantial portion of the accumulated earnings and profits of the business." *Liddon v. Commissioner,* 230 F.2d 304, 307 (6th Cir. 1956).

■ This is precisely the situation here. Capital Sales' entire operating assets were transferred to Southern Sash, and its business was continued exactly as before except under Southern Sash's name. The result is identical to that in previous cases in which reorganizations have been found:

> The [transferor corporation's] business was transferred to the new company, bearing a similar name and controlled by the same persons. It employed the same personnel, used the same facilities, had the same address, and dealt with the same clients as though nothing had occurred apart from the minor change in name of the business. There was here the most complete continuity of enterprise—the very kind of continuity that is basic to a corporate reorganization . . . .

*DeGroff v. Commissioner*, 54 T.C. 59, 72 (1970) (quoting *Moffatt v. Commissioner*, 42 T.C. 558, 578, aff'd, 363 F.2d 262 (9th Cir. 1966)). *See also Ringwalt v. United States*, 549 F.2d 89, 91 (8th Cir. 1977); *Lewis v. Commissioner*, 176 F.2d 646, 648 (1st Cir. 1949).

In light of this undisputed continuity of Capital Sales' business by Southern Sash, the fact that American-Standard technically transferred the Modernfold franchise should not require a different result. The evidence is clear that Mathis and Gilmore played an important role in having the franchise shifted to Southern Sash, albeit to prevent the account from being lost to an unrelated company. Courts have found reorganizations even though the transfer of a principal operating asset was carried out by a third party. *See, e. g., Commissioner v. Morgan*, 288 F.2d 676 (3d Cir. 1961) (principal asset of the transferor investment company, a contract to render advisory services to a mutual fund, shifted to the transferee company by the fund); *Liddon v. Commissioner*, 230 F.2d 304 (6th Cir. 1956) (transfer of principal asset, an automobile dealership franchise, carried out by General Motors, the franchisor). *Cf. Moffatt v. Commissioner*, 363 F.2d 262, 268 n.2 (9th Cir. 1966) (transferor's skilled employees, its most essential asset, made their own decision to shift to the transferee company); *DeGroff v. Commissioner*, 54 T.C. 59 (1970), aff'd, 444 F.2d 1385 (10th Cir. 1971) (transfer of the most valuable asset, an exclusive patent licensing agreement, carried out by the licensor). In *Liddon*, for example, the court held a reorganization occurred despite the fact the decision to transfer the automobile franchise lay entirely within the discretion of the franchisor. We hold, then, the requirement of a transfer of "substantially all" its assets was met in this case.

### A "Plan" of Reorganization

■ Taxpayers further contend the requirement of a "plan" of reorganization is not satisfied. They argue their plan was only to liquidate Capital Sales, not to reorganize their companies, and that the transfer of Capital Sales' operating assets to Southern Sash was made only as an incident to liquidation. To meet the requirement of a "plan," however, it is sufficient if the steps taken as a whole constitute a reorganization. *Davant v. Commissioner*, 366 F.2d 874, 883 (5th Cir. 1966); *Liddon v. Commissioner*, 230 F.2d 304, 309 (6th Cir. 1956). There need not be a written or formally-prepared plan of reorganization. *See, e. g., Smothers v. United States*, 1979–1 U.S.T.C. ¶ 9216 (S.D.Tex.1979), aff'd 642 F.2d 894 (5th Cir. 1981). *Rose v. United States*, 1979–1 U.S.T.C. ¶ 9194 (W.D.Wash. 1978); *Kind v. Commissioner*, 54 T.C. 600 (1970). The reorganization provisions are not voluntary, and a series of transactions may fall within their terms regardless of how they are characterized by the taxpayers. *Davant, supra*, 366 F.2d at 887.

■ Taxpayers' final contention is that the steps were taken out of a desire to retain the Modernfold account rather than to avoid taxes. The presence of a legitimate business purpose is not dispositive. Often, the reason for similar transactions is to consolidate separate businesses for greater efficiency, *see, e. g., Commissioner v. Morgan*, 288 F.2d 676 (3d Cir. 1961), or to buy out a minority shareholder, *see, e. g., Reef Corp. v. Commissioner*, 368 F.2d 125 (5th Cir. 1966); *Liddon v. Commissioner*, 230 F.2d 304 (6th Cir. 1956). Such business purposes will not prevent what is in substance a reorganization from being considered such for tax purposes. *Lewis v. Commissioner*, 176 F.2d 646, 650 (1st Cir. 1949); *Rose v. United States*, 1979–1 U.S. T.C. ¶ 9194 (W.D.Wash.1978) ("while the existence of a business purpose is a factor to be considered, it is not dispositive or controlling in determining whether a liquidation is or is not a step in a corporate reorganization").

A finding of reorganization in this case is supported not only by the case law, but also by an examination of the congressional intent underlying the liquidation and reorganization provisions, when they are viewed as a "functional whole." *Davant v. Commissioner*, 366 F.2d 874, 879 (5th Cir. 1966).

The purpose of the liquidation provisions is to provide capital gain or loss treatment for shareholders when their interest in a business or a distinct part thereof has been terminated and the assets distributed. I.R.C. §§ 331–337, 26 U.S.C.A. §§ 331–337. Such a distribution is considered the equivalent of a sale of stock which, of course, is the classic transaction subject to capital gain treatment. *See Pridemark, Inc. v. Commissioner*, 345 F.2d 35, 41 (4th Cir. 1965).

The reorganization provisions, on the other hand, provide relief where the business of a corporation will be continued by the shareholders but with changes in the corporate form. These provisions provide for the nonrecognition of gain or loss to the extent the shareholders exchange stocks or securities of the old corporation for those of the new. I.R.C. § 354, 26 U.S.C.A. § 354. Property received in the exchange other than stocks or securities, however, call "boot," is generally viewed as equivalent to dividends and is taxed as such, at least to the extent it represents undistributed earnings and profits of the corporation. I.R.C. § 356, 26 U.S.C.A. § 356. *See generally Davant v. Commissioner*, 366 F.2d 874, 882–87 (5th Cir. 1966).

Congress, then, has clearly mandated different tax consequences depending on whether a business is terminated or is instead carried on in a modified form. Where as here the business is continued under the control of the same shareholders, the reorganization provisions should be held applicable, provided the other requirements of these provisions are satisfied. The liquidation provisions should not be applied where they would enable "the stockholders of a corporation to withdraw its earnings and profits in the form of liquid or investment or other nonessential assets, to continue in the same relationship to 'the business,' and to avoid tax at ordinary income rates on what is essentially a dividend." *Wilson v. Commissioner*, 46 T.C. 334, 348 (1966).

We hold the transfer of the operating assets of Capital Sales to Southern Sash and the subsequent liquidation and distribution of the remaining Capital Sales' assets to its shareholders were integrated steps resulting in a reorganization. The decision of the Tax Court is therefore reversed.

In deciding this case, we express no opinion on whether a different result would be required if the shareholders of the original franchisee played absolutely no role in the transfer of the franchise to a related company, or if the franchise was transferred to an unrelated company with all the remaining operating assets transferred to a related company. Our holding is limited to the particular circumstances of this case.

Since the Tax Court held the distribution in this case was incident to a liquidation rather than a reorganization, it did not reach the issue of whether the distribution had "the effect of a dividend" within the meaning of section 356(a)(2). We therefore remand the case to the Tax Court for resolution of that issue and of the ultimate tax liability of the taxpayers.

REVERSED AND REMANDED.